On five occasions, Ms. Luke gave her employer medical documentation of her ability to work with an accommodation. After expressing her willingness and desire to work, her employer denied the accommodation in violation of the Pregnancy Discrimination Act. The Court erred in granting the defendant's motion for summary judgment in that it wrongly interpreted Young v. UPS by applying a narrow interpretation, and also it determined that evidence that was presented by the defendant, CPlace, they determined that evidence in a way that it drew an inference of a finding of fact in violation of what's required in a summary judgment motion. Of the four elements enunciated in Young v. UPS to establish a violation of pregnancy discrimination in the prima facie stage, the District Court determined that Luke did not prove CPlace had accommodated others similar in their ability and inability to work. In its reasoning, the Court stated that the specific accommodation by Ms. Luke and denied by CPlace had to have been granted to others. We contend that Young did not prescribe that the accommodation sought by others had to be exactly the same in every manner. Requiring such a rigid standard would make the law ineffective and creates a higher burden that was contemplated in Young. Well, let me ask you this. In other Title VII contexts where comparators are needed, I don't know of a case that has like if you have a Hispanic who claims he's being discriminated against because of his ethnicity that you can use any comparator other than somebody who's not Hispanic. I mean, if you use a Hispanic as a comparator, how can you draw the inference that the employer discriminates against Hispanics? So I mean, can you, I mean, there have been hundreds of these Title VII cases. Can you give me one where they've done anything different from that? Well, first, Young created a new standard in which we must look at comparators and look as to whether an accommodation was effectively exceeding the expectation. Show me where they're setting up a different standard for the comparator. It says others, which is what the statute says. We will look at the case of Deneen, Your Honor. In this particular case, the court looked at individuals who had problem pregnancies and the court said that those individuals could be compared to a person who had normal pregnancy. In Deneen, Ms. Deneen was determined to have a complicated pregnancy. And the court determined that it must determine whether those who had normal pregnancies were We contend in this particular case that Ms. Luke had medical documentation that required that she have her lifting restriction. Right, and the other people didn't, so doesn't that mean they have to be others who were similar in their ability or inability to work, so didn't she have greater restrictions on her work than the people who were allowed to get lifting assistance or whatever else? We contend that they were similar in their ability to lift, that they had problems lifting, which is documented that they received assistance in lifting. They received an on-the-job accommodation. They received the same type of accommodation that Ms. Luke was requested. And she was also requested. They didn't have a doctor's note saying you have a specific lift restriction, which is really what precipitated all this happening. She came back to work, then she has a new doctor's note, and after that she stops working again and then accumulates the leave time. And you're correct, Your Honor, and that's why we say that they can be used as comparators. Just as in Deneen, she had a medical complication just as Ms. Deneen had in that particular case. And the court said that it is appropriate to compare pregnant employees with other non-pregnant employees if there's an accommodation granted and the accommodation is not granted to one of the other pregnant employees. And so, to make sure I understand, then, your point is that for those employees who had a routine pregnancy, an accommodation was granted just to account for the fact that they were pregnant and whatever limitations may flow from that. Yes, Your Honor. And that the accommodations required by Ms. Luke were no different from the accommodations that were given to those who had a normal pregnancy. That's correct, Your Honor. That's exactly what the Deneen court determined. Be clear. Deneen was an intentional discrimination case. The court acknowledged they were not applying McDonnell Douglas. Well, the court did. And the case is a little confusing because it actually used, applied intentional discrimination, but it also referred to the McDonnell Douglas test. Well, they acknowledged they were not applying that test, that this was an intentional discrimination case. But they also used the McDonnell Douglas test in their reasoning and in their holding of the particular case. And that's why we argue that Deneen in this particular case is an appropriate case to look at when looking at Ms. Luke's decision. Actually what they were dealing with was pretext and not a comparator as far as meeting your, I mean, they didn't deal with the McDonnell Douglas standard at all. And you're right, Your Honor. In our case, we were dismissed at the prima facie stage. And we allege under Young that duty is not burdensome and the court dismissed us by making findings of fact, which is, which this court in Heinsohn specifically said that the trial court is not to make findings of fact. We allege that the trial court in our particular case did. That finding of fact was that there was only one type of accommodation that Luke sought and that was light duty. We contend that Ms. Luke sought several accommodations. Light duty was just one form. Where did she ever say, I'm happy working in my job and I'll just get the assistance I've always gotten and other people have gotten to help with lifting or to use mechanical devices to help people get out of bed? There is no question and it is specifically admitted by the defendant that Ms. Luke did ask that she be transferred. And Ms. Luke also- No one else has been, there's no person you can identify who was given that type of transfer. Pregnant, not pregnant. Judge, there is no additional person that we can use as a comparator, but we also believe as was in Luke, that we can use the policy and procedures of C-PLACE to determine whether we met our prima facie case. What I'm getting at is if your case hinges on that she wasn't allowed the assistance that some other people were, or really that she previously was, she never said I'm happy staying at work as long as I get the assistance other people had and I've had before. Judge, I would refer- She brings the doctors know that I have this lifting restriction, I need to be transferred to another position basically that has light duty. They say so, we don't have such a position. She takes leave. And Judge, at that stage again, I'd like to bring the court back to that's determining whether they had light duty or not is giving their reason for the discriminatory animus. I know that you're arguing that's not my question. My question is, how can you rely on their refusal, supposed refusal to let her work with assistance from others when she didn't say, oh, you can't transfer me to light duty? Okay, I'll still stay on as long as I get the help you've given other people. Your Honor, I refer, that's in the record, I refer you to Ms. Luke's note of 2-16-2012 to her employer. It says, to whom it may concern, on January 23, 2012, I was forced to accept FMLA leave because I was directed to by my doctor to only do light duty work. I feel there is sufficient light duty work that I can complete for the benefit of your agency. My job is really important to me and it is necessary I continue to work. I am requested that I be allowed to return to work. I am able to perform all of my duties except lifting patients. I ask that you work with me and allow my supervisors to make reasonable adjustments to the type of work I'm able to perform while under doctor's care. That's the note that Ms. Luke sent to her employer on February 16, 2012. That's part of the record and that was introduced by the defendant themselves in their motion for renewed summary judgment. Wouldn't we be creating a circuit split to say that the plaintiff here can use another pregnant woman or herself as a comparator? I mean, we've got a 4th Circuit case and a 7th Circuit case that just flatly hold that under the PDA to have a comparator must be some non-pregnant worker with a similar disability. I again refer to Young, Judge, and excuse me, Your Honor, excuse me. Young outlines a new test and it says that we look at . . . What is the language in the test that would change this? I think it's an interpretation of the language using the Dineen case, that we can use women who are different in certain circumstances that were given an accommodation, light duty, that was not afforded to our client some form of light duty or modification or assistance in her job. The statute says pregnancy and other conditions, so you're saying there's different conditions that are associated with pregnancy. Some people have certain ones, some people don't. Yes, Your Honor. That and conditions that it gives the distinction you're trying to push. Yes. Would that apply to say a black person who brings a Title VII case with a back injury? Could he use another black person who had a little different back injury? We would contend yes, if they were alleging . . . A back injury would be an ADA claim and we're not trying to include the ADA claim here, but we would allege that if there was an accommodation necessary and it was given to one individual, mindful of their color, it would also be given to that other individual. But I also want to point out to the court really quickly is that that's not the only evidence that we're using to determine whether we've met our prima facie case. We also argue that we've met our prima facie case because they had a policy and procedure that gave light duty to others. There was an ADA requirement that gave accommodations to others and there was also those individuals who were hurt on the job. This is exactly the information that the court looked at in Young to determine that that prima facie case was met and we were not allowed to continue and dismiss that summary judgment.  All right. Thank you, counsel. Ms. Thomas. What should we . . . We've got another. Oh, I'm sorry. You're right. Is that . . . Good morning and may it please the court. I'm Jillian Thomas with the American Civil Liberties Union appearing on behalf of 25 organizations that work to advance women's and workers' rights both in the Fifth Circuit and nationwide. And we appreciate the opportunity to participate in today's oral argument. The Supreme Court granted certiorari in Young v. UPS to reverse a negative trend, an anti-plaintiff trend in cases involving the PDA's second clause, the one demanding that pregnant workers be treated the same as others similar in their ability or inability to work. And specifically, the court was concerned with an overly narrow, cramped reading of who was a comparator to a pregnant worker for purposes of that clause. And indeed, the court lists in Young v. UPS cases it was seeking to correct, including the Urbano case from this circuit, which involved a finding that the plaintiff hadn't made out the prima facie case because the employer granted light duty to workers injured on the job. And so the court said, those aren't proper comparators. She can't make out the prima facie case. Young expressly wanted to reverse that trend so as to fulfill the purpose of the Pregnancy Discrimination Act, which is to assure that women are not pushed out of work due to pregnancy unless, as the court said, the employer has a sufficiently strong reason for doing so that outweighs the burden on the pregnant worker. The district court here misapplied that new prima facie standard, much more generous to plaintiffs. And it also conflated the pretext phase with the prima facie standard, and in the process misapplied the new pretext standard as well. And for this reason, we argue that remand is appropriate. If this ruling stands, the courthouse doors will be closed to countless pregnant women like Ms. Luke because they are unable, at the initial stage, before even discovery, to identify people exactly like them. But you had plenty of discovery, didn't you? After we remanded in light of Young, wasn't there additional discovery that Judge Jackson allowed? Absolutely, Your Honor. And it's our contention that at the prima facie stage, Ms. Luke had more than satisfied what Young requires. In Young, after all, it was also a prima facie case. I'm just confused why you say it has to do with a pre-discovery issue. I thought there was ample discovery in this case. I meant, Your Honor, in terms of setting a precedent for future cases, that this is what you have to satisfy to make out the prima facie case, to survive a motion to dismiss. What does she have to satisfy to make out a prima facie case? I beg your pardon? What does she have to do to make out a prima facie case? So Your Honor, in Young, the court was faced not with evidence of individual comparators, but just with policies. There were three categories of workers who were granted accommodation under UPS's policies. Those who qualified under the ADA, those who had an on-the-job injury, and those who had had their Department of Transportation licenses revoked. Now, those could have been revoked for medical reasons, but they also could have been revoked simply because a driver had a DUI conviction. So clearly, a very expansive group of potentially comparable workers whom the Supreme Court said was sufficient to make out that fourth prong, in other words, policy alone. Now, as Mr. Woods has stated, we don't have just a policy here. We did have an explicit ADA policy, which the Supreme Court has not said is per se non-comparable. We also have evidence that they had lifts, and that people, both pregnant and non-pregnant, used the lifts. Why does the facility have mechanical lifts, if not to help lift people? Moreover, we have evidence of how Ms. Luke herself— You're answering my, what does she have to show to make out a prima facie case question? Yes, Your Honor. I kind of wanted to hear A, B, C, 1, 2, 3. I beg your pardon, Your Honor? All right. So, to make out the prima facie case, it's four elements. She must be, must have been pregnant, must have sought an accommodation, must have been denied that accommodation, and then must be able to point to others who are comparable or similar in their ability or inability to work who received accommodations. And the way you— And our problem is at number four. Correct. Correct. All right. My apologies, Your Honor. What did Young say about others? What does others mean? Well, Your Honor, it's very broad. And it's— What specifically did they say that would give some meaning to others different from what's always been given in the other Title VII cases? They rejected a definition that the others have to be exactly, they have to be identical in every manner but the protected— That's all been part of the Title VII law. Well, but it was expanded upon in Young in that the lower court had said that these three categories were not comparable to Ms. Young. Those injured on the job, not comparable to her. Those covered by the ADA mandate, not comparable to her. Those who didn't have their DOT licenses, not comparable to her. And the court said, why, yes, at least at the prima facie stage, they are comparable to her. But the key, and it comes from the statute, is they do have to be similar with respect to their ability or inability to work. Correct. And so how is that true of the plaintiff here and the other individuals she's trying to use as comparators when she had this doctor's note saying, I mean, she had more severe restrictions than they did? How is she similar in her ability to work when her doctor's saying no restriction, or these lifting restrictions, and she needs light duty? Well, first of all, I think that there are a number of questions of fact around this that should have been put off to the, and put in front of the fact finder. Well, I'm glad you said that because I'm wondering if you're agreeing that her restrictions were any more severe than a normal pregnancy. Are you agreeing that they were? Not necessarily. I mean, if you are, you are. I'm just asking. I think the more important inquiry here is how did the employer view her, and the employer viewed her as a problem. As a problem, right? Now that you're arguing she was a problem in pregnancy, these were regular pregnancies and that's a new one. She didn't necessarily – her note does not say she has complications. Her note does not say it's an irregular pregnancy. She simply was – Just a lifting restriction. She was – yes, absolutely, which is a very common restriction. But isn't your claim that she did have another pregnancy and conditions because she was perceived as a problem? That she was seen as a problem, correct. But it's a distinction, Your Honor, and it's a very common one that comes up in the pregnancy context and the disability context, for that matter, which is that someone with a physical condition may – they may have the same condition, which in this case is pregnancy, but the employer deems one of them more troublesome than another. And as a result – The ADA actually has a separate perceived as disabled category for recognizing that problem. Precisely. Precisely. And so that's our argument here with respect to using the pregnant comparators, that there are some – and we see this very commonly in our work and in other cases. Very commonly, an employer deems one kind of pregnant person a good kind of pregnant person. She doesn't have any morning sickness. She doesn't have any lifting restrictions. So – But she did say her medical condition required light duty, whereas I don't see that any of these other people said they needed light duty. Your Honor, the term light duty was for doctor's term and also a sort of ill-defined term of art, frankly. And that's our problem here with the – with the district court short-circuiting any sort of further conversation about the case, short-circuiting at the comparability phase because, as counsel already noted, he framed the inquiry as who was granted the she asked for. That is just far too narrow and does not – does not meet the standard of a generous application of the prima facie case, which is not supposed to be onerous, not supposed to be inflexible, not to go to the merits, and not to require that the comparator be identical in all but the protected ways. So the judge here accepted as true the employer's version of events that a light duty accommodation was all that – what all that Ms. Luke had sought, when in fact the very – the very essence of determining what's a reasonable accommodation is going to be a conversation. And we have to look at the result here. The result here is that someone with a 30-pound lifting restriction lost her job and her income just when she needed it most. Even the district court found that an unthinkable outcome. And it's our contention that he reached that conclusion erroneously and unnecessarily. So – and just moving on, on to the other ways in which the plaintiff had satisfied the fourth standard, which I – I'm apparently out of my time. Are there any further questions I could answer before I sit? Thank you, counsel. Okay. Ms. Samuel, we just want to make sure we didn't overlook any other advocates. All of them. We got them all. All right. You may proceed. All right. Good morning, Your Honors. My name is Melissa Samuel, and I'm here today on behalf of C-Place Forest Park, who I'll refer to throughout this argument here today as Nottingham, since that's how they were known as Nottingham Regional Medical Center – I'm sorry, Regional Rehab Center. I think you all focus on a really good point, right? What – who are the others? And what the Supreme Court said is they have to be employees whose situation cannot reasonably be distinguished from Young's. That's how it was defined. And when we hear argument about the prima facie case was very broad and was no longer going to be narrow and no longer require all these elements, there is one element that is specifically required that the district court properly found was not met. The plaintiff, Ms. Luke, was required to show that she was denied an accommodation that others were granted. And here, there is no record evidence of that. There is, in fact, no record evidence that anyone ever requested an accommodation due to a 30-pound lifting restriction or any other restriction. Judge Jackson was concerned with that. He thought that couldn't be the case. What if the evidence is no one needed to request it because all they had to do was use a machine or call up a co-worker and say, hey, help me with this, and it happened? Right. And let's talk about that. What if the evidence showed that? Do we know that it didn't show that? What the evidence showed with respect to the mechanical lift is that the mechanical lift was a new machine that was brought into the organization, but it required two to three people to operate, and it was only utilized with respect to injured, bed-ridden patients who could not ambulate on their own. So for Luke to use that lift for every patient would mean that two to three people had to be helping her on each occasion, and that's in the record at 1847 to 1849, the deposition testimony of Michael Bolivny. We know that that was not happening with other pregnant employees. Correct. And what was happening with the other pregnant employees is that they had no restrictions. They never requested any accommodations. They all testified they didn't need any accommodations. So the question was put, but did anybody ever help you? And they said, well, yeah. I mean, sometimes if I needed help, someone might help me, or one woman whose husband worked there, I might ask my husband if he would come help me. These are not requests for an accommodation to be made by Nottingham. These are co-workers helping each other out on an ad hoc basis versus someone who admittedly could not do the essential functions of her position. She couldn't do her job with that 30-pound lifting restriction. So she needed a continuous accommodation. She needed every day to have someone help her with that lifting. Every day she would need help to transfer a patient from the bed to a wheelchair, from the wheelchair to a toilet, to walk behind the patients as she's required to do to make sure she can catch them if they fall, to help bathe them and dress them and clean them. These are all functions that she admitted at her deposition required lifting and required lifting of 30 pounds. And she— What about as a comparator? Yuki Stokes, I think, testified about being taken off the hall, reassigned to handling doctor's appointments and passing out laundry during part of her pregnancy. Right. And Ms. Stokes worked at a different facility, but she also—well, she worked at two different facilities at different times. And she did recall testifying that her supervisor voluntarily did that for her in the very final weeks of her pregnancy. And that was not an accommodation that was requested. It didn't go through Human Resources. There was no process. But again, you're talking about two pregnant workers. And I think we have to go back to, is that what Young said? And Young said that you have to be comparing others. It is not probative to compare two people with pregnancies and then even to say two people with problems in their pregnancies and say, well, you did provide a temporary accommodation for a couple of weeks here, but you didn't provide it here, and therefore that is pregnancy discrimination. They're both pregnancy. They're both pregnancy-related disabilities. It's not probative of pregnancy discrimination. And— But the statute does prohibit not just pregnancy discrimination, but discriminating on the basis of pregnancy or other conditions. Now, maybe plaintiff's not pushing that. I'm a little confused now. But someone—it's not just pregnancy that's protected. If someone has an aggravated condition due to pregnancy, that's also protected, correct? It is protected. If they have an aggravated condition due to pregnancy. And what's interesting, I think, is when you look at Young and what the Supreme Court actually said before they made their decision, which is, we note essentially our decision may not have that much importance anymore because under the ADA Amendments Act in 2008, disability now includes temporary disabilities, including pregnancy. So I think what's interesting in the arguments that have been raised by the other side is this extension of Young. This extension of Young to include, for example, the reasonable accommodation obligations that might be present under the ADA, or the interactive process obligations that might be present under the ADA. Well, what the Supreme Court said when they announced Young is, we don't really need to get to any of that because now they can sue under the ADA for those precise things. There's no reason to extend it in the disparate treatment context. If we were going to look at it in terms of disparate treatment, we would have to say there was something requested by one person that was also requested by another, and it was not given here, and it was given here, and pregnancy or some pregnancy condition was the determining factor. And that there was no evidence of. When the court looked at this, the district court was troubled. Remarkably, Judge Jackson said in his opinion, I don't like the outcome. But the outcome was compelled by the law and the facts. He gave three rounds of discovery. In fact, the last round of discovery was after we filed our renewed summary judgment motion, and Judge Jackson said, you need to go get evidence of this. So go get the evidence. The reality is the evidence didn't exist. This is a small residential care facility, and those accommodation requests had never been made by any others. There's no evidence that any others had made those accommodation requests, and therefore there was no evidence of disparate treatment. How many other nursing assistants worked at that facility? I'm sorry. I'm not going to have the precise number. I believe there was about 20. I believe there was about 20. That's considered small. I mean, it's a small—well, so there were 100 beds, and each person had 15 people. So each person had 15 people. So when you look at it, when you look at the facts in light of the test for Young, there is no evidence to satisfy the fourth element, as the court held. I would like to talk a little bit about the policies, which has been— Before you move to that, so you acknowledge that other people had assistance from their co-workers, et cetera. You're just saying that's not the proper inquiry, because the inquiry here is light duty, because that's what she requested? We acknowledge that there was testimony that from time to time, co-workers would either offer or an individual might request for some ad hoc help. There's no indication of how often that happened, whether it was a regular occurrence, and certainly no indication that those individuals ever requested from the facility to have continuous help. And so that there—when you look at what Young said has to be the case, whose situation cannot reasonably be distinguished from Young, it's a very reasonable distinction between these folks. You're talking about someone who doesn't have a restriction, who never requested an accommodation, who never needed an accommodation, just from time to time asked for some help. And indeed, the policies at the facility were, if you have a particularly heavy lift, regardless of whether you're disabled, not disabled, pregnant, not pregnant, you should get help if you have a particularly heavy lift. The difference, of course, is that if you cannot do the day-to-day functions, as Ms. Luke admitted she could not do, and she admitted that repeatedly in her deposition, then the issue is, what is the employer to do? So the employer here did evaluate whether there were other positions available. There were no other positions available that would accommodate those restrictions. And there's no evidence that the employer ever transferred any other individuals to light duty. So again, you fail on that fourth point of the prima facie case. Then what does the employer do from there? The employer puts her out on leave and gives her leave until the leave under the applicable law expires. And at that point, she still can't return to work. There still are no light duty positions. And so acting in compliance with the law, they say, return after you have your children. And actually, she did not. And everything that Nottingham did was in compliance with the law. They evaluated her need for an accommodation. They determined they didn't have an applicable accommodation. With respect, we've already talked a little bit about the mechanical lift and the other lifting assistant. There was some discussion about whether or not she could be reassigned. And there was some discussion in the briefs about other potential positions. But there was never any testimony. In fact, the testimony was consistent that there were no other positions open. And so therefore, there was no position to put her into. Now, with respect to the argument about there needing to be an imposition of an interactive process, which has been raised by both the amicus briefs as well as Luke herself, I would just submit to your honors that that's not an issue that's properly before the court because it was not raised at the district court level. There was never an argument that there was some failure to engage in an interactive process that was raised before Judge Jackson. I would also say that to the extent they're arguing for that extension of Luke, as we discussed already, the Supreme Court already indicated that the ADA now applies to these temporary conditions. So there's no reason to extend Luke to have that affirmative obligation that's contained in the ADA to extend that affirmative obligation in the Title VII context. So really, if you were going to make a Title VII PDA argument about interactive process, what you would have to argue is that we engaged in an interactive process with others, but didn't engage in an interactive process with Luke. Again, this was never raised before the district court, so those facts have never been developed, and we would submit that there is no evidence of any accommodations being requested. That's been developed in the record, so there certainly would be no evidence that we engaged in an interactive process. How do you respond to his argument? I think Plaintiff's counsel cited that February note she sent, saying basically the way he was interpreting it, even if I can't get a new assignment, I can do the job, I can come back with help. Is your response to that just that no one was given that type of help in the past? Well, it's two things. When the note was received, the testimony was, we understood what she was saying, however, that didn't change the fact that she couldn't do the job. And so even if you were looking at the broader ADA standard, the ADA doesn't require you to eliminate essential functions. So essentially what that note was requesting was transfer to a different position or eliminate some of these functions, modify my job so that I don't have to do these functions. And even under the broader ADA standard, and we've cited those cases here, you don't have to eliminate the essential functions of the position and including lifting as an essential function. So if an essential function is lifting, you don't have to eliminate that. So you're really back to light duty. All of these requests essentially in their core go back to a need for light duty or a transfer to a different position altogether, and that didn't exist. And I did want to just discuss the issue of the policies. Throughout the argument by both Luke's counsel and Amicus, there's this discussion about the policies being discriminatory on their face. There's no evidence of that. It's a complete misrepresentation of the record as far as we are concerned. The policies are neutral. They say we will accommodate, provide all accommodations required by law. And the testimony from those who are in charge of enforcing the policy said, and what we interpreted that to mean is anybody who needed an accommodation for any reason, we would provide all accommodations that we could as required by law. So first and foremost, there's nothing in that policy that distinguishes, like in the UPS case, we will provide light duty to these three sets of people, but not these sets of people. There's nothing in our policy that's similar in that respect. And secondly, that policy is not evidence that we in fact did provide accommodations. It's that we would provide accommodations to the extent they were available. They were not available here. So the argument that the policy either- I guess I understood the argument to be the latter and not the former. But maybe they were arguing that the policy is on its face, discriminatory on its face. Right. I think there were two arguments. I think Amicus was arguing that the policy was discriminatory on its face, and maybe I misunderstood that as well. And then that second argument by Luke's counsel was that the policy is evidence that we did in fact provide accommodations, and that's just simply not the case. Saying that you will provide accommodations is certainly not evidence that you ever did. And the testimony in the record on that has been clear from the outset that they didn't. Again, I understand Judge Jackson's concern in saying, let's get some evidence, let's develop it, let's see whether anybody ever got an accommodation, anyone, ever, anywhere. And the record evidence at the end of the day was, no, none were ever requested, none were ever received. Any other questions from you, Your Honor? Thank you. All right. Thank you, counsel. Rebuttal? Yes, Your Honor. Your Honor, in this particular case, I would like to remind the Court that our case was dismissed at the prima facie stage. And that's what's of issue. The fourth element of that particular test, were individuals visually similarly accommodated given an accommodation? In order to answer that question regarding the prima facie issue, we have to look at Young v. UPS. In Young v. UPS, the evidence that was determined that that particular plaintiff met their case at the prima facie stage was, there was an ADA policy that allowed work accommodations. Two, individuals who were injured on the job received an accommodation. And three, individuals who lost their license were also given an accommodation. In Young, the Court said that was sufficient for the prima facie case to be met. In our case, Your Honor, there was an ADA policy that's in the Record on Appeal that they gave accommodations to those who were qualified under the ADA. There's testimony that individuals who were injured on the job were given an accommodation. That's completely analogous to Young. Who are the comparators for that? The injured workers. I'm sorry? Who were the injured workers who were given duties similar to what she was requesting? We have no specific workers, but those were the policies just as it was in Young. In Young, the Court did not name any individuals. They said these policies existed, and as a result of these policies existing, we can move to the second phase, where the defendant gives their reason for denying the accommodation. That's what the defendant's argument here is about today. They're defending their not giving Ms. Luke an accommodation, but we're not at that stage. Again, we're at the prima facie stage. Our evidence is analogous to the evidence that was presented in Young, but we not only presented that evidence, we also presented evidence which this Court has an issue with, but there were pregnant women who did not have a doctor's note or had any issue during pregnancy that were accommodated and given on-the-job duty accommodations that was not afforded to Ms. Luke. These are issues and findings of fact that the Court drew. Other pregnant women were given these accommodations, and this goes back to what Judge Davis asked maybe at the beginning. How does showing that pregnant women got accommodations show that there's animus against pregnant women? Typically, you show, I'm a woman, look at these men who were treated better. That shows this is because I'm a woman. You don't say, look at these women who were also treated better than I was. Your earlier comments, Judge, that there can be subsets of women, and Ms. Luke was an individual who had twins who had received a doctor's note saying that she could not lift more than 30 pounds. We contend that, yes, Ms. Luke could not perform her job duties without an accommodation, but with an accommodation, she could perform the duties. Her job just did not require lifting. There were other components of her job that she could do, and in fact, Michael Bolany, an employee of the defendant, stated in testimony that there was ample work for her to do, and he allowed her to do light duty for two days, Michael Bolany's testimony. Now there's question as to whether he could make that determination, but that's an issue that has to be determined by the trial court, not at summary judgment. What's the status of the state case that got remanded? It's still pending, Your Honor. It's still pending. Thank you.